| | |
|---|---|
| Minute Order Form (06/97) | |

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James H. Alesia | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 1805 | **DATE** | December 18, 2001 |
| **CASE TITLE** | *Leonard Juniel, Sr. vs. Park Forest-Chicago Heights School District 163* | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. The court grants defendant's motion for summary judgment [41-1]. Final judgment in this case is entered in favor of defendant, Park Forest-Chicago Heights School District 163, and against plaintiff, Leonard Juniel, Sr.. No motions for reconsideration will be entertained.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | DEC 19 2001 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 49 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | | DOCKETING DEC 18 PM 5:42 | DEC 19 2001 date mailed notice | |
| CW | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

DEC 19 2001

| | |
|---|---|
| LEONARD JUNIEL, SR., | ) |
| Plaintiff, | ) |
| v. | ) Case No. 00 C 1805 |
| PARK FOREST-CHICAGO HEIGHTS SCHOOL DISTRICT 163, | ) Judge James H. Alesia |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Before the court is defendant Park Forest-Chicago Heights School District 163's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). For the following reasons, the court grants defendant's motion for summary judgment.

## I. BACKGROUND[1]

Beginning February 1996, plaintiff Leonard Juniel, Sr. ("Juniel"), an African-American, was employed in an educational support or administrative personnel position as the Director of Technology for defendant Park Forest-Chicago Heights School District 163 ("the District"). Juniel was not a certified teacher. Rather, his duties included: (1) planning, organizing, and controlling the overall activities of electronic data processing, including systems analysis, programming, and computer operation activities as related to the District's business operations, instructional programs, and pupil and personnel record-keeping; (2) assisting the superintendent

---

[1] Unless otherwise indicated, the following facts – taken from the parties' Local Rule 56.1 statements – are undisputed.

in keeping personnel informed as to the applications and developments in the fields of electronic data processing in education; (3) maintaining a cooperative relationship and open communication with those holding similar positions in other districts in the region and state, to investigate and implement feasible data-processing programs on a multi-district basis; (4) evaluating the District's use of data processing, and recommending modification, direction, and expansion as necessary; (5) supervising feasibility and procedural studies; (6) directing, planning, and coordinating the programming and operation of all data-processing and technology activities; (7) directing development of new software and coordinating testing, implementation and documentation; (8) providing guidance and assistance to all potential users of data-processing equipment; (9) supervising installation of equipment; (10) monitoring the utilization of equipment and providing for scheduled maintenance to hold downtime to a minimum; (11) keeping continually informed of the development of data-processing functions in the educational field, and advising the administration of these developments, together with recommendations for possible implementation in the District; (12) assisting in preparation and administration of the budget for the data-processing department; (13) reporting to management on progress and data-processing development projects, resource utilization and production performance; (14) projecting data-processing resource requirements, including personnel, equipment and housing with associated costs, and coordinating with the planning and budgeting cycle of the District; (15) evaluating new technical developments in view of the District's plan and objective; (16) maintaining inventory records of software, hardware, and peripherals by serial number and location for insurance and security reasons; (17) maintaining district-wide student data and the

nature of enrollment, test results and demographics; (18) installing software, set-up menus, maintaining back-up and advising and assisting with hard disk management; (19) working cooperatively with the testing coordinator in the development and analysis of district norm referenced and criterion reference material; (20) developing, implementing and enforcing procedures and security standards for software access and modifications that ensure the integrity of programs and data; (21) documenting current systems; and (22) fulfilling additional administrative reporting requirements as assigned. While working for the District, Juniel also assisted in obtaining a $152,888 technology grant as part of the Technology Integration Program Initiative.

In the Spring of 1998, the Board of Education of the District ("the Board"), which was at the time comprised of four African-Americans and three Caucasians, determined that it was necessary to cut $300,000 from its budget. The Board consulted with Dr. Elizabeth Reynolds ("Reynolds"), Superintendent of the District. Reynolds, an African-American, recommended that the Board eliminate the Director of Technology position. Shortly before March 30, 1998, a meeting was held wherein Juniel was notified that his position was targeted for elimination. Reynolds told Juniel that the Board action to terminate his employment was part of a reduction-in-force ("RIF") and that the elimination of his position was not due to his performance. However, the District claims that Juniel's performance – specifically his failure to develop a district-wide technology plan, his failure to spend sixty percent of his time meeting with staff and students, and his failure to publish a periodic technology newsletter for the District – contributed to Reynolds's recommendation and the Board's decision to terminate the position of Director of

Technology. Juniel received informal notice of the RIF between March 30, 1998 and April 15, 1998. Then, on April 10, 1998, Juniel received formal notice of the RIF in the form of a certified letter notifying him of his honorable dismissal effective May 30, 1998. Juniel alleges by affidavit that at some indeterminate time after his dismissal, his wife "saw a directory of the school district for the fall of 1998, where Mike Nicolai, (Caucasian) and Robert Thomas (Caucasian) are listed as 'District office technology' staff." (Juniel Aff. ¶ 3.)

The position of Director of Technology was discontinued and still does not exist in the District. Rather, the District reorganized its technology program to focus on teaching technology to teachers in the classroom. Some of the twenty-two duties and responsibilities of the Director of Technology position were spread among numerous individuals at the District.[2] Reynolds herself personally assumed many of the duties, and the remaining duties were either unassigned or were assigned to the business manager, a consultant in Tennessee, or various teachers and administrators, including Mike Nicolai ("Nicolai") and Bob Thomas ("Thomas"). Nicolai and Thomas were Caucasian teachers who worked with technology in the District prior to Juniel's termination. No single Director of Technology duty was reassigned exclusively to Nicholai or

---

[2] The undisputed evidence shows that all but the following duties were redistributed: (1) monitoring the utilization of equipment and providing for maintenance to hold downtime to a minimum; (2) projecting data processing resource requirements, including personnel, equipment and housing with associated costs, and coordinating with the planning and budgeting cycle of the District; (3) maintaining inventory records of software, hardware and peripherals by serial number and location for insurance and security reasons; (4) developing, implementing, and enforcing procedures and security standards for software access and modifications that ensure the integrity of programs and data; (5) documenting the current system; and (6) fulfilling additional administrative reporting requirements as assigned. However, the sixteen remaining duties were redistributed to other administrators, teachers, the superintendent, the business manager, and a consultant.

Thomas without the help of other teachers and administrators, and Nicolai and Thomas were not solely assigned all of Juniel's duties.[3]

Seventeen other employees – twelve Caucasians and five African-Americans – lost their jobs in the alleged RIF during the 1997-98 school year. However, during the 1998-99 school year, the District hired sixty-seven new employees – thirty Caucasians and thirty-seven African-Americans.[4] Of the four administrators hired during this time period, two were African-American and two were Caucasian. During both the 1997-98 school year and the 1998-99

---

[3] Juniel argues that Nicolai and Thomas absorbed all of Juniel's job responsibilities, but the record does not support this assertion. Rather, the record shows that after Juniel's employment was terminated, Nicolai and Thomas worked with other teachers and administrators on the following duties: (1) planning, organizing, and controlling the overall activities of electronic data-processing, including systems analysis, programming, and computer operation activities as related to the District's business operations, instructional programs, and pupil and personnel recordkeeping; (2) directing, planning, and coordinating the programming and operation of all data processing and technology activities; and (3) directing development of new software and coordinating testing, implementation, and documentation. The record shows that Nicolai and Thomas acted like "tech aides," working with teachers in the classroom to show them how to use the technology – work Nicolai and Thomas never saw Juniel do. Thomas testified he does "the little grub things. ... People will get a disk stuck in their A drive. Well, kids particularly will shove them in backwards. And so I go out and operate on the machines to take those things out." (Thomas Dep. at pp. 13-14.)

[4] In its 56.1 Statement of Facts, the District states, "During the *1996-97 school year*, the District hired sixty-seven (67) new employees." (Def.'s Loc. Rule Stmt. of Mat. Facts ¶ 23.) (emphasis added). Juniel admits this fact but denies its relevance. (Pl.'s Loc. Rule 56.1 Stmt. & Add'l Facts ¶ 23.) To support this fact, however, the District submits an exhibit headed, "Hired June 1998-June 1999." The exhibit is an unlabeled chart including (1) a column of names, presumably the names of those hired from June 1998-June 1999; (2) a column with either a "B" or "W," presumably indicating the race – Black or White – of the individual hired; (3) a column with an abbreviation for the individual's job position; and (4) a date ranging from "03-12-98" to "01-3-00." The heading of the chart and the dates in the final column, along with the fact that the District's hiring practice in the 1998-99 school year is clearly relevant to Juniel's Spring 1998 dismissal while its hiring practice in the 1996-97 school year is not clearly relevant, the court assumes that these sixty-seven new employees were hired during or for the 1998-99 school year.

5

school year, the District employed twelve management employees – seven African-Americans and five Caucasians.[5] Reynolds also recommended that the positions of Jacquelyn Davis ("Davis"), an African-American, and Karen Eisenbart ("Eisenbart"), a Caucasian, be eliminated as part of the budget cuts. The Board decided to eliminate Davis's job position but not Eisenbart's.[6] At the time, Davis was the Director of Curriculum at the District, and Eisenbart was the Grants Administrator. As Grants Administrator, Eisenbart brought in millions of dollars worth of general grants to the District.

On April 21, 1999, Juniel filed a charge with the EEOC alleging that the District discriminated against him based on his race in regard to his dismissal, in violation of Title VII of the Civil Rights Act of 1964. On December 29, 1999, Juniel received a right to sue letter from the EEOC. On March 24, 2000, Juniel filed a *pro se* complaint of employment discrimination, alleging that the District discriminated against him because of his race, in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §§ 1981 and 1983. Juniel subsequently retained an attorney to represent him in this case, but his counsel did not amend the *pro se* complaint. On September 20, 2001, the court granted the District's motion for summary judgment on

---

[5]In its 56.1 Statement of Facts, the District labels these employees "administrative or quasi-administrative" employees. (Def.'s Loc. Rule Stmt. of Mat. Facts ¶ 26.) (emphasis added). Again, Juniel admits this fact but denies its relevance. (Pl.'s Loc. Rule 56.1 Stmt. & Add'l Facts ¶ 26.) However, because the exhibit the District submits to support this fact labels these employees "management employees," the court refers to them as such.

[6]Although the parties agree that the Board decided to eliminate Davis's job position (Pl.'s Loc. Rule 56.1 Stmt. & Add'l Facts ¶ 38, Def.'s Resp. to Pl.'s Add'l Facts ¶ 38), Davis states in her deposition that she left the District for professional growth reasons. (Davis Dep. at p. 9.) After leaving her Director of Curriculum position at the District, Davis became employed elsewhere as the Coordinator of Grants Projects.

6

Juniel's Title VII claim because it was time-barred. *See Juniel v. Park Forest-Chicago Heights Sch. Dist. 163*, 161 F. Supp. 2d 910 (N.D. Ill. 2001). The District now moves for summary judgment on Juniel's §§ 1981 and 1983 claims.

## II. DISCUSSION

### A. Summary judgment standard

Summary judgment is appropriate only where "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see Funeral Fin. Sys. v. United States*, 234 F.3d 1015, 1017 (7th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). A genuine issue of material fact exists when, viewing the record and drawing all reasonable inferences in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Smith v. Severn*, 129 F.3d 419, 425 (7th Cir. 1997).

The moving party bears the burden of showing that no genuine issue of material fact exists. *Celotex*, 477 U.S. at 325. Once the moving party makes a *prima facie* showing that it is entitled to judgment as a matter of law, the non-moving party must set forth specific facts showing that a genuine issue for trial exists. *Id.* at 324; *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989). The non-moving party cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine triable issue. *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992). The non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

7

The District argues that it is entitled to summary judgment on Juniel's §§ 1981 and 1983 claims because Juniel cannot establish a *prima facie* case of race discrimination. Although the District has not attacked the sufficiency of Juniel's claim on the basis that he has not set forth elements necessary to establish §§ 1981 and 1983 municipal liability against the District under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the court still must address this issue. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 736-37 (1989) ("[T]o prevail on his claim for damages against the school district, petitioner must show that the violation of his 'right to make contracts' protected by § 1981 was caused by a custom or policy within the meaning of *Monell* and subsequent cases."). *See also Smith v. Chi. Sch. Reform Bd. of Trs.*, 165 F.3d 1142, 1148 (7th Cir. 1999) ("*Monell* does not create a 'defense.' It identifies an element of a plaintiff's claim, so the burden is on the plaintiff to demonstrate the essential policy or custom.") (citing *Bd. of County of Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) ("[I]n *Monell* and subsequent cases, we have required a plaintiff seeking to impose liability on a municipality ... to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."). First the court will address municipal liability under §§ 1981 and 1983. Then the court will address the merits of Juniel's §§ 1981 and 1983 claims.

## B. <u>Municipal liability under §§ 1981 and 1983</u>

Recovery against a governmental entity – including a school board or school district – under §§ 1981 or 1983 may not be based on *respondeat superior*. Rather, a plaintiff must show that the government entity's official policy or custom was discriminatory. *Jett*, 491 U.S. at 736-37; *Monell*, 436 U.S. at 694; *Smith*, 165 F.3d at 1148.[7] A "custom" or "policy" can take one of three forms: (1) an express policy that, when enforced, causes a constitutional deprivation; (2)

---

[7]In *Smith*, the Seventh Circuit cited *Fed'n of African-American Contractors v. Oakland*, 96 F.3d 1204, 1215 (9th Cir. 1996), for the conclusion that this aspect of *Jett* – recovery against a governmental body under § 1981 requires a showing that the body's official policy or custom was discriminatory – remains good law after the Civil Rights Act of 1991 amended § 1981 to add subsection (c).

a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute "custom or usage" with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority. *Burke v. Chi. Sch. Reform Bd. of Trs.*, 169 F. Supp. 2d 843, 846 (N.D. Ill. 2001) (citing *Brokaw v. Mercer County*, 235 F.3d 1000, 1013 (7th Cir. 2000)). Thus, "custom or policy" may be established by an allegation that the constitutional injury was caused by a person with "final policymaking authority." *McCormick v. City of Chi.*, 230 F.3d 319, 324 (7th Cir. 2000). *See also Baxter v. Vigo County Sch. Corp.*, 26 F.3d 728, 735 (7th Cir. 1994) ("It is true that a single act or decision of a final policymaker can establish municipal policy.").

Here, Juniel has neither alleged nor identified that the state or District has either an "express policy" of race discrimination or a "custom or usage with the force of law." He also has not alleged that his injury was caused by any individual or group with final policymaking authority. Although Juniel names the District as the sole defendant in his suit, he alleges that the Board made the final decision regarding his discharge at the recommendation of Superintendent Reynolds. However, Juniel has not met his burden of demonstrating that either the Board or the Superintendent has final policymaking authority with respect to discharging educational support or administrative personnel. *See Gernatzke v. Kenosha Unified Sch. Dist. No. 1*, No. 01-2084, 2001 WL 1590094 (7th Cir. Dec. 14, 2001) (stating that a plaintiff "must show that the district itself, which is to say the officials or official boards that constitute the relevant final decisionmaking authority (legislative or executive) within the district, was directly responsible for the deprivation.") Whether a particular individual has "final policymaking authority" is a question of state law. *Bogosian v. Bd. of Educ.*, 134 F. Supp. 2d 952, 962 (N.D. Ill. 2001) (citing *Duda v. Bd. of Educ.*, 133 F.3d 1054, 1061 (7th Cir. 1998)). In Illinois, the board of education is a final policymaking authority for the purposes of decisions to hire and fire *certified teachers*. *Bogosian*, 134 F. Supp. 2d at 962 (citing 105 ILL. COMP. STAT. 5/10-21.1, 10-22.4 and *Midwest Cent. Educ. Ass'n v. Ill. Educ. Labor Relations Bd.*, 660 N.E.2d 151, 155 (1995)). However, the

Illinois Code clearly distinguishes between certified teachers and non-certified educational support personnel, and Juniel has not demonstrated that under Illinois law the Board is a final policymaking authority for purposes of decisions to hire and fire non-certified educational support or administrative personnel.

In sum, Juniel has failed to meet his burden of establishing municipal liability under *Monell* because he fails to establish that his injury was caused by an individual or entity with final policymaking authority with respect to discharging non-certified educational support or administrative personnel. Therefore, the court concludes that Juniel has not met his burden of establishing that he was deprived of his constitutional rights by an individual acting under the color of state law, and his §§ 1981 and 1983 claims fail. However, as discussed below, even if Juniel had met his burden of establishing municipal liability, his claim still would fail on the merits.

### C. The merits of Juniel's §§ 1981 and 1983 race discrimination claims

Juniel alleges that the District discriminated against him by terminating his employment because of his race. Assuming *arguendo* Juniel met his burden of establishing municipal liability under *Monell*, his claims still would fail on the merits.

#### 1. Juniel's § 1981 claim

Section 1981 proscribes discrimination based on race and ethnicity in the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(a)-(b). "A plaintiff bringing suit under section 1981 ... can meet his burden of proof for establishing intentional discrimination either through direct proof of discriminatory intent, ... or through the indirect, burden-shifting method of proof ...." *Von Zuckerstein v. Argonne Nat'l Lab.*, 984 F.2d 1467, 1472 (7th Cir. 1993) (citations omitted). A *prima facie* case of race discrimination under § 1981 is predicated on the same elements as a race discrimination claim under Title VII. *Lalvani v. Cook County, Ill.*, 269 F.3d 785, 788 (7th Cir. 2001).

10

Under Title VII, discrimination may be established in either of two ways – through direct evidence or through the indirect burden-shifting method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *McCarthy v. Kemper Life Ins. Cos.*, 924 F.2d 683, 686 (7th Cir. 1991). Here, Juniel has offered no direct evidence to support his claim of race discrimination, and he does not argue that he has any such evidence.[8] Therefore, he must use the *McDonnell Douglas* burden-shifting method.

Under *McDonnell Douglas*, a plaintiff must first establish, by a preponderance of the evidence, a *prima facie* case of employment discrimination. *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff establishes a *prima facie* case, then the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its allegedly biased employment decision. *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 931 (7th Cir. 1996). If the employer meets its burden, then the plaintiff must show, by a preponderance of the evidence, that the employer's stated reason for dismissal is nothing more than pretext. *Id.*

### a. Juniel's *prima facie* case

To establish a *prima facie* case of employment discrimination, Juniel must show: (1) he belongs to a protected group; (2) he performed satisfactorily; (3) his employer subjected him to an adverse employment action; and (4) similarly-situated employees outside his classification received more favorable treatment. *Hughes v. Brown*, 20 F.3d 745, 746 (7th Cir. 1994). Neither party addresses the first or third elements of Juniel's *prima facie* case. The District, however, contends that Juniel has failed to establish elements two and four of his *prima facie* case.

---

[8]Even if Juniel argued that he had direct evidence of race discrimination, such argument would fail. Juniel does not offer any evidence that proves without inference that the District discriminated based on his race. *See Cowan v. Glenbrook Sec. Servs. Inc.*, 123 F.3d 438, 443 (7th Cir. 1997) (stating that direct evidence is "evidence which if believed by the trier of fact, will prove the particular fact in question without reliance on inference or presumption."). Further, Juniel has not offered a mosaic of circumstantial evidence which shows that the District's decision was motivated by race discrimination. *See Pafford v. Herman*, 148 F.3d 658, 665 (7th Cir. 1998); *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994).

To establish the second element of the *prima facie* case, a plaintiff bears a burden of producing evidence that he was meeting his employer's legitimate expectation at the time of his termination. *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 743 (7th Cir. 1999); *Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1262 (7th Cir. 1993). Here, Juniel claims that he always received good performance evaluations. (Pl.'s Loc. Rule 56.1 Stmt. & Add'l Facts ¶ 33.) Although a plaintiff can establish the second element of the *prima facie* case through his own testimony that his performance was satisfactory, *Weihaupt v. Am. Med. Ass'n*, 874 F.2d 419, 428 (7th Cir. 1989), Juniel offers no testimony or affidavit showing that his performance was satisfactory at the time of his termination. Instead, Juniel attaches certain commendations and evaluations to support this assertion.

Juniel attaches the following documents: (1) a positive evaluation dated July 1, 1996, from Dr. Boyd, the Superintendent who initially recommended that the District hire Juniel; (2) a certificate of appreciation dated April 29, 1997, from the Illinois State Board of Education; (3) an evaluation dated July 3, 1997, from Jean Bernstein at the Office of the Superintendent which lists nine goals Juniel completed during the 1996-97 school year and nine goals he still needed to accomplish; and (4) a November 27, 1997 newspaper clipping which states that certain students constructed a working computer under Juniel's direction. Juniel presents no evidence that his performance was satisfactory at the time his employment was terminated in the Spring of 1998, or even that his performance was satisfactory at any time during the 1997-98 school year. *See Johnson*, 170 F.3d at 743 (stating that a plaintiff can meet his burden by producing consistently positive performance evaluations that indicate that the plaintiff was meeting his employer's legitimate expectations, but not by producing evaluations that evidence a pattern of declining performance).

Juniel also argues that he developed the District Technology Plan. To support this claim, Juniel offers a letter from Frank Della ("Della"), the technology coordinator for South Cook Intermediate Service Center 4, to then-Superintendent Bernstein, dated May 20, 1997, that

communicates that the Technology Plan submitted met federal standards but failed to meet state standards and needed "to be reworked." In his letter, Della offered to meet personally with the District's technology planning team to provide feedback and add ideas about the process by which planning should be done to meet state standards. Juniel also presents testimony from Judith Wolf ("Wolf"), who was the District's Payroll Benefits Coordinator, which states that she saw a document entitled "the technology plan for the school district" and that

> I believe, if I'm not mistaken, and I don't really remember, it was a five-year plan, I believe, that we had applied for a grant it seems to me. And we offered a five-year plan of what we were going to do. ... I want to say the original document Leonard probably was involved in along with, I believe, Margaret McDannel and Mae Wiza.

(Wolf Dep. at p. 22.) Neither Della's letter nor Wolf's testimony confirm that Juniel in fact completed the Technology Plan to meet federal and state standards or that he was fulfilling the District's legitimate expectations at the time his employment was terminated.

Thus, Juniel has failed to establish that he performed satisfactorily at the time his employment was terminated. By not establishing element two of the *prima facie* case, Juniel has failed to meet his burden of establishing a *prima facie* case of discrimination, and the court need not address element four of his *prima facie* case, that the District gave more favorable treatment to a similarly-situated employee who was not African-American.[9]

---

[9]If the court were to examine the fourth element of Juniel's *prima facie* case, his claim still would fail on this basis. The only person Juniel cites as a similarly-situated employee was Eisenbart, the District's Grants Administrator. However, Juniel fails to present evidence such that a reasonable jury could find that both he and Eisenbart had the same job functions or skills. The undisputed evidence establishes that the District believed that Eisenbart was a more valuable employee than Juniel. At most, Juniel shows that both he and Eisenbart worked in educational support or administrative positions, and that Juniel assisted in securing a single technology grant worth $152,888 while Eisenbart worked full time as the District's Grants Administrator and secured over a million dollars in general grant funds for the District. This is not enough to show that Eisenbart is a similarly-situated employee. Accordingly, Juniel has failed to establish the fourth element of his *prima facie* case. Further, even if the court were to determine that this was a "single-discharge" or "mini-RIF" case because some of Juniel's job duties were reassigned to
(continued...)

### b. Legitimate nondiscriminatory reasons

Furthermore, even assuming *arguendo* that Juniel established his *prima facie* case of race discrimination, the District has articulated several legitimate, nondiscriminatory reasons for discharging Juniel. The District asserts that it decided to eliminate Juniel's job because Juniel (1) failed to develop the district-wide Technology Plan, (2) failed to spend sixty percent of his time in the District schools meeting with the staff and students, and (3) failed to publish a regular technology newsletter for distribution through the District. In support, the District offers two memos written from Reynolds to Juniel, dated November 12, 1997 and March 30, 1998, requesting that Juniel present his progress on the Technology Plan for the District. These documents demonstrate that at the time of his termination Juniel had still not successfully completed the Technology Plan in accordance with state standards. As the Seventh Circuit has stated, the court will "not sit as a super-personnel department that reexamines an entity's business decisions." *Debs v. Northeastern Ill. Univ.*, 153 F.3d 390, 396 (7th Cir. 1998). Thus, the District has articulated a legitimate, nondiscriminatory reason for discharging Juniel.

### c. Pretext

Because the District has articulated a legitimate, nondiscriminatory reason for its decision, Juniel must show that each proffered reason is pretextual. To do so, Juniel must "*specifically* refute the facts which allegedly support the employer's proffered reasons." *Mills v. First Fed. Sav. & Loan Ass'n*, 83 F.3d 833, 845 (7th Cir. 1996) (citation omitted) (emphasis in original). Further, to demonstrate pretext, Juniel "must show more than that the employer's decision was incorrect; [Juniel] must also show the employer lied about its proffered

---

⁹(...continued)
existing employees, the undisputed evidence does not establish that he was effectively "replaced" by employees outside his protected class. *See Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 693 (7th Cir. 2000) (stating that a "mini-RIF" occurs when an employee's position is eliminated but his former responsibilities are assumed by other employees, and that in mini-RIF cases, a plaintiff can establish the fourth element of his *prima facie* case by showing that his duties were absorbed by employees who were not members of the protected class).

explanation." *Johnson*, 260 F.3d at 732 (internal quotations omitted). *See also Alexander v. Wis. Dept. of Health & Family Servs.*, 263 F.3d 673, 683 (7th Cir. 2001) ("[W]hen reviewing a grant of summary judgment, the only question before us is whether the plaintiff has provided evidence from which a rational trier of fact could infer that the employer's stated reasons for taking the adverse action were lies."); *Tincher v. Wal-Mart Stores, Inc.*, 118 F.3d 1125, 1130 (7th Cir. 1997) ("The mere fact that the employer acted incorrectly or undesirably ... cannot adequately demonstrate pretext ....").

To show that the proffered nondiscriminatory reason is pretextual, Juniel must show one of the following: (1) the District's explanation of the adverse employment action had no basis in fact, or (2) the explanation was not the "real" reason, or (3) the reason stated was insufficient to warrant the allegedly discriminatory action. *Id.* Thus, Juniel's burden is to show that the District lied when it stated that it believed that Juniel (1) failed to develop the district-wide Technology Plan, (2) failed to spend sixty percent of his time in the District schools meeting with the staff and students, and (3) failed to publish a regular technology newsletter for distribution through the District despite being charged with doing so. *See Velasco v. Ill. Dep't of Human Servs.*, 246 F.3d 1010, 1017 (7th Cir. 2001) (stating that a plaintiff cannot withstand summary judgment if he fails to create a triable issue of fact with respect to each of his employer's legitimate reasons). Juniel presents no arguments that the District lied. Rather, Juniel argues that he was given inconsistent reasons for his termination and that these inconsistencies raise a question on pretext.

It is an undisputed fact that Reynolds told Juniel that the Board action terminating Juniel's employment was part of a RIF and that the elimination of his position was not due to his performance. However, the District claims that Juniel's performance – specifically his failure to develop a district-wide technology plan, his failure to spend sixty percent of his time meeting with staff and students, and his failure to publish a periodic technology newsletter for the District – contributed to Reynold's recommendation and the Board's decision to terminate the position

15

of Director of Technology. Juniel argues that pretext exists because these two explanations are inconsistent. Although shifting reasons for an employment decision can raise a fact question on pretext, Juniel must show evidence of a significant discrepancy in the reasons offered by the employer. *See O'Connor v. DePaul Univ.*, 123 F.3d 665, 670 (7th Cir. 1997) (finding that different reasons for discharge were not inconsistent and therefore did not raise a fact question on pretext); *Timm v. Mead Corp.*, 32 F.3d 273, 275-76 (7th Cir. 1994) (finding that a rating of "competent" was not inconsistent with the stated reason that the plaintiff was discharged for performance problems); *Ducharme v. Hall Signs, Inc.*, No. IP99-1756-C-H/G, 2001 WL 1168160, at *15 (S.D. Ind. 2001) (finding that a vague reason of "we're letting you go ... there's no place for you in that [newly reorganized] arrangement" was not inconsistent with later stated reason that it terminated the plaintiff's employment for performance problems).

Even viewing the evidence in the light reasonably most favorable to Juniel, the District's statement that it was honorably discharging Juniel as part of a RIF is not sufficiently inconsistent with a statement that it was terminating his employment for performance problems. At most, the District's statement that it was honorably discharging Juniel as part of the RIF did not reveal the motivation behind its decision, and Juniel "cannot raise a fact question on pretext by simply showing that [he] was not given a full explanation (or any explanation) of the reasons when [he] was fired." *Ducharme*, 2001 WL 1168160, at *15. This is not a case where the reason for termination identified by the defendant during litigation is different from the reason identified at the time of termination. *See Starks v. George Court Co.*, 937 F.2d 311, 314 (7th Cir. 1991) (finding pretext when, in addition to evidence of racially hostile incidents, plaintiff showed that his employer provided three drastically inconsistent versions of why the plaintiff had been fired -- in an EEOC questionnaire, in an affidavit, and in trial testimony).

It is well-established that an employer is free to develop its own criteria in making business decisions, and it is not the court's place to evaluate the wisdom of those decisions. *Johnson*, 260 F.3d at 733. The law requires only that an employer honestly believed its reason for its actions, even if its reason was foolish, trivial or baseless. *Id.* The court's only concern

at the pretext stage is whether the employer honestly remained dissatisfied with its employee's performance. *Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 602 (7th Cir. 2001). Here, Juniel does not challenge the supported fact that the District was honestly dissatisfied with Juniel's performance, particularly the fact that he had not completed the technology plan. Further, Juniel has offered no evidence that his employment was terminated because of his race rather than by the District's legitimate belief that such actions were justified, or even that discrimination "tipped the balance" in favor of discharge. *See Schmidt v. R. Lavin & Sons, Inc.*, No. 00 C 0804, 2001 WL 290362, at *4 (N.D. Ill. Mar. 22, 2001) (describing "tipping the balance" as the plaintiff's burden of establishing pretext in a true RIF). Thus, Juniel has not presented any evidence that would cause a reasonable factfinder to question whether the District honestly believed its assessment. Therefore, Juniel has failed to establish that the District's proffered reasons are mere pretext.

In sum, Juniel has failed to establish his *prima facie* case and has failed to show that the District's proffered reasons were pretextual. Thus, the court finds that the District is entitled to judgment as a matter of law on Juniel's § 1981. Accordingly, the court grants the District's motion for summary judgment on Juniel's § 1981 claim.

### 2. Juniel's § 1983 Claim

Section 1983 "creates a federal cause of action for 'the deprivation, under color of [state] law, of a citizen's rights, privileges, or immunities secured by the Constitution and the laws of the United States.'" *Ledford v. Sullivan*, 105 F.3d 354, 356 (7th Cir. 1997) (quoting *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994)). To state a claim under § 1983, a plaintiff must allege that: (1) the person who committed the allegedly wrongful conduct acted under color of state law; and (2) this conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. *See Harris v. City of Chi.*, Nos. 96 CV 3406, 96 CV 7526, 1998 WL 59873, at *12 (N.D. Ill. Feb. 9, 1998). Juniel does not articulate the basis of his § 1983 claim. Assuming this claim is a § 1983 claim based on a violation of the Equal Protection Clause, this claim requires a showing that the alleged violators purposefully or

intentionally discriminated against the plaintiff because of his race. *Dugan v. Ball State Univ.*, 815 F.2d 1132, 1135 n.1 (7th Cir. 1987); *Ford v. City of Rockford*, No. 88 C 20323, 1992 WL 309603, at *3 (N.D. Ill. Oct. 15, 1992). Here, as discussed *supra* Sect. II.C.1, Juniel has not established intentional discrimination. If Juniel bases his § 1983 claim on denial of due process claiming that the District deprived him of his property interest of his continued employment, this claim would fail as well because Juniel has made no allegation or showing that he was denied adequate due process before his employment was terminated. Therefore, Juniel's § 1983 claim fails, and the court finds that the District is entitled to judgment as a matter of law on Juniel's § 1983 claim. Accordingly, the court grants the District's motion for summary judgment on Juniel's § 1983 claim.

## CONCLUSION

For the foregoing reasons, the court grants defendant's motion for summary judgment on plaintiff's §§ 1981 and 1983 claims.

Date: DEC 18 2001

James H. Alesia
United States District Judge